# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW MEXICO

DARVIN DAHL, *individually and on*
*behalf of all those similarly situated*,

      Plaintiffs,

v.                                                                       Civ. No. 22-252 GJF/DLM

PETROPLEX ACIDIZING, INC.,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on Plaintiffs' Motion for Conditional Certification [ECF 45] ("Motion"). The Motion is fully briefed. *See* ECFs 46 ("Response"); 47 ("Reply"). Having reviewed this record, the applicable law, and for the reasons explained below, the Court **GRANTS IN PART** the Motion and **RESERVES RULING IN PART**.

## I.  BACKGROUND[1]

Defendant Petroplex Acidizing, Inc. ("Petroplex"), a Texas corporation doing business in New Mexico, offers "production services and technology and downhole services to the oil field industry." ECFs 1 ¶¶ 2.2, 5.1; 45 at 2 (citing https://petroplex.com). Specifically, Petroplex provides acidizing and cementing services throughout the Permian Basin in New Mexico and West

---

[1] In support of their Motion, Plaintiffs attach sworn declarations [ECFs 45-2–45-4], a July 11, 2014 offer of employment from Petroplex to named plaintiff Darvin Dahl [ECF 45-5], job descriptions from Petroplex's Indeed.com job postings [ECFs 45-6–45-8], and Petroplex's First Supplemental Answers and Objections to Plaintiffs' First Set of Interrogatories [ECF 45-9]. At the conditional certification stage, courts typically need only consider the substantial allegations of the complaint along with any supporting declarations or affidavits. *Bowling v. DaVita, Inc.*, No. 21-CV-03033-NYW-KLM, 2023 WL 4364140, at *3 (D. Colo. July 6, 2023) (citations omitted). Nevertheless, courts *may* "consider other evidence obtained through early discovery." *Id.* (citations omitted); *see also James v. Boyd Gaming Corp.*, 522 F. Supp. 3d 892, 912 (D. Kan. 2021) (considering deposition testimony and interrogatory answers at conditional certification stage). Here, the Court will consider Plaintiffs' submissions, to which Petroplex does not object, but it will refrain from weighing the evidence, resolving factual disputes, or reaching the merits of the pending claims at the conditional certification stage. *See MacDonald v. Covenant Testing Techs., LLC*, No. 18-cv-02290-NRN, 2019 WL 1755282, at *3 (D. Colo. Apr. 18, 2019).

Texas. ECFs 45-2 ¶ 2; 46 at 3 (citing ECF 7-1 ¶ 4). To perform these services, Petroplex hired and

continues to hire Acidizers/Treaters[2] to perform well stimulation services. ECFs 1 ¶ 5.2; 45-2 ¶ 2.

Plaintiff Darvin Dahl, one such Acidizer/Treater, filed this action individually and behalf of those

similarly situated, alleging that Petroplex violated wage and overtime laws under the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. §§ 201-10 (2012), and the New Mexico Minimum Wage Act

("NMMWA"), N.M. Stat. Ann. §§ 50-4-19–30 (2016).[3]

Plaintiffs' Motion seeks conditional certification of a collective action for Petroplex's

alleged violations of an FLSA provision that requires an employer to pay its employees at least

150% of their hourly pay rate when they work in excess of 40 hours in one workweek. ECF 45 at

15, 20–21. Plaintiffs allege that Petroplex improperly classified Acidizers/Treaters as exempt from

FLSA's overtime provisions and failed to pay them at the time-and-one-half overtime rate. ECF

¶¶ 5.10–5.11; 5.23; 8.5–8.6.

Here, by the time the instant Motion was filed, two Consents to Become Party Plaintiff had

also been submitted. *See* ECFs 43–44. Accordingly, the plaintiffs moving for conditional

certification consist of Plaintiff Dahl, who worked for Petroplex as an Acidizer/Treater from July

2014 to January 14, 2022 [ECFs 1 ¶ 2.1; 45-2 ¶¶ 3, 8], and two Opt-In Plaintiffs, Kelley Ullrich

and Jesse Martinez, who worked for Petroplex as Acidizers/Treaters from August 2021 to April

2022, and from July 2021 to July 2022, respectively [ECFs 43–44; 45-3 ¶ 3; 45-4 ¶ 3]. Since the

---

[2] Throughout the filings, the parties refer to the employees who perform acidizing and well stimulation services by different but similar job titles, including Acid Treaters/Supervisors and Acid Supervisors. For purposes of the instant Motion, the parties do not dispute that these job titles refer to the same job. Moreover, the Court observes that for conditional certification the positions of the putative collective members need not be identical, only *similar*. *See Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996); *Kerr v. K. Allred Oilfield Servs., LLC*, No. 20-CV-00477, 2020 WL 6799017, at *4 (D.N.M. Nov. 19, 2020).

[3] Plaintiffs' Motion does not request class certification under Federal Rule of Civil Procedure 23 for their state law claims. *See* ECF 45.

filing of the Motion, another former Acidizer/Treater filed his Consent to Become a Party Plaintiff and, thus, Frederic Vaughn, Sr, became the third Opt-In Plaintiff. *See* ECF 49.

Plaintiffs attest that "Petroplex assigned [them] to work on projects in New Mexico and Texas." ECFs 45-2 ¶ 8; 45-3 ¶ 8; 45-4 ¶ 8. In his May 2022 affidavit, Kyle Cunningham, Petroplex's CEO and President, acknowledged that despite maintaining its principal place of business in Texas, Petroplex does "some work" in New Mexico and, in fact, has a yard in Lovington, New Mexico.[4] ECF 7-1 ¶¶ 2, 5–6. Nevertheless, Cunningham insisted that the majority of Petroplex's work—roughly 75–80%—is performed in Texas. ECF 7-1 ¶ 6. Cunningham attested that the address Petroplex maintained for Plaintiff Dahl was an address in Odessa, Texas, where he alleged Dahl lived while working for Petroplex. ECF 7-1 ¶ 7. Cunningham further avowed that "Dahl primarily worked in Texas when working for Petroplex." ECF 7-1 ¶ 8. As to other Petroplex employees who held the same position as Plaintiff Dahl, Cunningham represented that "most Acid Treaters/Supervisors live and work in Texas, approximately 76% over the last three years." ECF 7-1 ¶ 12. For instance, of the 34 individuals identified in discovery as "Acid Supervisors who worked for [Petroplex] from April 20, 2020[,] to the present in the Permian Basin,"[5] Petroplex observes that only four used New Mexico mailing addresses.[6] ECF 46 at 3; *see also* ECF 45-9 at 7, 12–13.

Here, Plaintiffs Dahl, Ullrich, and Martinez each swore out declarations detailing their claims and the facts supporting a collective action. *See* ECFs 45-2–45-4. They recount that, in their

---

[4] Mr. Cunningham's affidavit was submitted to the Court in support of Petroplex's Motion to Dismiss [ECF 7-1], which the Court denied [ECF 23]. Petroplex once again relies upon this affidavit in its opposition to Plaintiff's Motion to Certify. ECF 46 at 10–11.

[5] In its response to Plaintiffs' interrogatory, Petroplex stated that the identified individuals "worked in New Mexico within the [relevant] period." ECF 45-9 at 7.

[6] Among the Acidizers/Treaters who reported a New Mexico address is the most recent Plaintiff to join this action: Fred Vaughn. *See* ECFs 45-9 at 12; 49.

roles as Acidizers/Treaters for Petroplex, they were required to load equipment and materials at the Petroplex facility, drive the treater van to the project location, "rig[] up" the acidizing equipment, operate the pumps from the treater van, and "rig[] down" the equipment once the job was complete. ECFs 45-2 ¶¶ 9, 11–12, 16, 18; 45-3 ¶¶ 9, 11–12, 16, 18; 45-4 ¶¶ 9, 11–12, 16, 18. Plaintiffs explain that they performed these duties in accordance with the acidization procedures set out and controlled by Petroplex representatives and were not permitted to deviate from the prescribed procedures. ECFs 45-2 ¶¶ 13–17; 45-3 ¶¶ 13–17; 45-4 ¶¶ 13–17.

Plaintiffs further report that they regularly worked more than 40 hours per week—typically in the range of 70–100 hours. ECFs 45-2 ¶ 5; 45-3 ¶ 5; 45-4 ¶ 5. Yet, according to Plaintiffs, they did not receive overtime pay. ECFs 45-2 ¶ 6; 45-3 ¶ 6; 45-4 ¶ 6; *see also* ECF 1 ¶ 5.9 (Dahl asserting that Petroplex failed to "pay [him] for the hours he worked in excess of forty per week 'at a rate not less than one and one-half times the regular rate at which he [was] employed.'") (citing 29 U.S.C. § 207(a)(7)). Instead, Plaintiffs allege they were paid on a salary-plus-daily-job-bonus basis regardless of the number of hours they worked.[7] ECFs 1 ¶¶ 1.2, 2.4, 5.9, 5.21; 45-2 ¶¶ 4, 7; 45-3 ¶ 4, 7; 45-4 ¶ 4, 7; 45-5 at 2 (Jan. 11, 2014 letter from Petroplex offering Dahl a position as "Treater Trainee" with pay on a semi-monthly basis "plus $150.00 per job Bonus"); 45-6–45-8 (Petroplex's Indeed.com job postings advertising for "Acid Treater/Supervisor[s]" in New Mexico and Texas and describing the positions as "Salaried Position[s] with Job Bonuses"). Plaintiffs emphasize that Petroplex advertised that "long hours" were required for its Acid Treater/Supervisor positions. ECF 45 at 11 (citing ECF 45-8 (Indeed.com posting by Petroplex for

---

[7] Dahl, for instance, specifies that he was paid a semi-monthly salary of $5,500.00 plus an additional daily job bonus of $150.00 per day. ECF 45-2 ¶ 4. Opt-In Plaintiff Ullrich was paid a semi-monthly salary of $4,000.00 plus an additional daily job bonus of $150.00 per job [ECF 45-3 ¶ 4], and Opt-In Plaintiff Martinez was paid a semi-monthly salary of $4,500.00 plus a daily job bonus of $150.00 per job [ECF 45-4 ¶ 4]. Although Dahl indicates that he was paid a $150 bonus *per day*, and the other plaintiffs report that they were paid a $150 bonus *per job*, Petroplex makes no argument that a distinction in the method of bonus payments is significant for purposes of the present motion.

Acid Treater/Supervisor in Lovington, New Mexico)).

In addition, Plaintiffs attest that their observations and conversations with other Acidizers/Treaters revealed that Petroplex paid other individuals working in the same role on a salary-plus-daily-job-bonus basis with no overtime pay. ECFs 45-2 ¶ 20; 45-3 ¶ 20; 45-4 ¶ 20. In fact, each Plaintiff identifies fellow Acidizers/Treaters who worked more than 40 hours per week but were not paid overtime. ECFs 45-2 ¶ 21; 45-3 ¶ 21; 45-4 ¶ 21. Collectively, they identify 15 such employees. ECFs 45-2 ¶ 21 (identifying five Acidizers/Treaters); 45-3 ¶ 21 (identifying four Acidizers/Treaters); 45-4 ¶ 21 (identifying six Acidizers/Treaters). Relatedly, Plaintiff Dahl alleges in the Complaint that "[e]ven if their job titles and precise job duties differed, [Petroplex] subjected [him] and other Acidizers/Treaters like [him] to the same or similar illegal pay practices for similar work." ECF 1 ¶ 5.8. Plaintiff Dahl further insists that he was "not exempt from the maximum hour requirements of" the FLSA.[8] ECF 1 ¶¶ 5.10, 5.11.

Plaintiffs argue that they have satisfied their "modest factual burden" with "sufficient proof of the common pay scheme" [ECF 45 at 9] and ask the Court to authorize the mailing of notice to a proposed FLSA collective comprised of:

> All current and former Acid Treaters/Acidizers who [were] employed with [Petroplex], and who, like Plaintiff, were paid on a salary basis and a daily job bonus and were not paid time and one-half their respective rates of pay for all hours worked over forty in each seven-day workweek in New Mexico and Texas beginning three years preceding the date this lawsuit was filed and forward.

ECF 45 at 9. In addition, Plaintiffs request an order requiring Petroplex to provide contact information for any current or former employee who might qualify as a putative plaintiff. *Id.* at 25–26.

---

[8] Relatedly, Dahl asserts that, in the event Petroplex classified him as exempt from FLSA's maximum hour requirements, he was misclassified. ECF 1 ¶ 5.23.

## II.   LEGAL STANDARD

Congress enacted the FLSA in 1938 to eliminate substandard working conditions caused by the "unequal bargaining power as between employer and employee . . . ." *See generally Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706 (1945). Subject to certain exclusions, Section 207 of the FLSA generally requires a covered employer to pay its employees at least one-and-a-half times their hourly wages for any hours worked beyond 40 per week. 29 U.S.C. § 207. To promote the vindication of FLSA rights, the FLSA allows an employee to bring claims against his employer individually or collectively through "conditional certification"—a designation that allows the employee to form a temporary class on behalf of himself and "similarly situated" coworkers. 29 U.S.C. § 216(b).[9] On a sufficient showing, the plaintiff-employee becomes entitled to court-authorized notice to alert similarly-situated employees of their opportunity to bring claims against their employer. *See Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1102–03 (10th Cir. 2001).

Because the FLSA does not define the term "similarly situated," the Tenth Circuit endorses a two-stage process for evaluating FLSA collective action certifications. *Id.* at 1105. The first stage—or so-called "notice stage"—asks whether the putative collective members are sufficiently

---

[9] The FLSA provides in relevant part:

> Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages . . . .  An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and on behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b).

"similarly situated" to authorize the issuance of mailed notice to other potential plaintiffs. *See*, *e.g.*, *In re Bank of Am. Wage & Hour Emp. Litig.*, 286 F.R.D. 572, 576 (D. Kan. Sept. 27, 2012); *see also Folger v. Medicalodges, Inc.*, No. 13-1203, 2014 WL 2885363, at *2 (D. Kan. June 25, 2014). This analysis begins with "the logical preliminary question [of] whether the putative class shares similar job duties with plaintiff." *See*, *e.g.*, *Stubbs v. McDonald's Corp.*, 227 F.R.D. 661, 665 (D. Kan. Mar. 4, 2004). Their positions and claims need not be identical, only *similar*. *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996); *Kerr v. K. Allred Oilfield Servs., LLC*, No. 20-CV-00477, 2020 WL 6799017, at *4 (D.N.M. Nov. 19, 2020).

The standard at the first stage is "fairly lenient." *Thiessen*, 267 F.3d at 1103; *see also Baldozier v. Am. Family Mut. Ins. Co.*, 375 F. Supp. 2d 1089, 1092 (D. Colo. 2005); *Renfro v. Spartan Comp. Servs., Inc.*, 243 F.R.D. 431, 432 (D. Kan. 2007). It requires the complaint or sworn statements provide "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Thiessen*, 267 F.3d at 1102 (citations omitted). Those allegations must "describe the potential class within reasonable limits and provide some factual basis from which the court can determine if similarly situated potential plaintiffs exist." *Landry v. Swire Oilfield Servs., L.L.C.*, 252 F. Supp. 3d 1079, 1114 (D.N.M. 2017) (citations omitted). The court weighs the plaintiff's showing by looking to considerations such as whether the potential collective members: (1) had the same employer; (2) were subject to the same practices; (3) were paid under the same method of wage calculation; and (4) allege FLSA violations based on the same conduct. *Pruess v. Presbyterian Health Plan, Inc.*, No. 19-CV-629, 2020 WL 6544243, at *3 (D.N.M. Nov. 6, 2020). In conducting this inquiry, the Court must be mindful not to "weigh the evidence, resolve factual disputes, or rule on the merits of plaintiffs' claims." *Landry*, 252 F. Supp. 3d at 1116 (citation omitted).

Once presented with sufficient allegations of commonality, the court sets a notice period. 29 U.S.C. § 255(a). The statute of limitations is determined by the alleged FLSA violation. *Id*. By default, the limitations period is the preceding two years. *Id*. If, however, the complaint accuses the employer of a willful violation, the statute allows a three-year period. *Id*. When the notice period expires, the action proceeds to the second stage: the "decertification stage." *See, e.g.*, *Thiessen*, 267 F.3d at 1105.[10]

## III.  PARTIES' ARGUMENTS

Plaintiffs argue that the putative collective members are "similarly situated" because they work or worked for Petroplex and were subject to a uniform pay policy. ECF 45 at 8. Specifically, Plaintiffs allege that Petroplex's Acidizers/Treaters were paid on a salary-plus-daily-job-bonus basis and were denied overtime pay in violation of the FLSA. *Id*.

Petroplex responds that the Court lacks personal jurisdiction over a majority of the current and former Acidizers/Treaters, who Petroplex insists lived and worked in Texas. ECF 46 at 2. Relatedly, Petroplex argues that Plaintiffs have failed to show that the putative collective was similarly situated insofar as other Acidizers/Treaters also worked more than 40 hours per workweek *in New Mexico*. *Id*. Alternatively, if the Court finds Plaintiffs have met their burden on conditional certification, Petroplex contends that the "scope of the collective should not include Texas residents who did not work in New Mexico at all or who did not work over 40 hours in a workweek in New Mexico." *Id*. Finally, Petroplex articulates objections to the manner of notice Plaintiffs propose, asserting that Plaintiffs' counsel should not be permitted to send out a reminder notice, make live phone calls, or leave voice messages for the putative collective members. *Id*.

---

[10] The decertification stage typically begins on defendant's motion once discovery ends. *See, e.g.*, *Thiessen*, 267 F.3d at 1102–03. At that stage, whether the case proceeds as a collective action depends on judicial application of a stricter "similarly situated" standard. *Id*.

## IV.  DISCUSSION

When evaluating a motion for conditional certification, a court applies a lenient test to determine whether the plaintiffs are similarly situated—that is, whether they provided "substantial allegations that the putative [collective] members were together the victims of a single decision, policy, or plan." *Thiessen*, 267 F.3d at 1102 (citations omitted); *accord* 29 U.S.C. § 216(b). The parties certainly address this issue. But Petroplex points to a more fundamental constraint on the Court's authority to conditionally certify an FLSA collective. As Petroplex sees it, the Court lacks personal jurisdiction over claims brought by any non-resident plaintiffs for alleged FLSA violations that took place outside of New Mexico. ECF 46 at 5–11. Consequently, the Court must first satisfy itself that personal jurisdiction exists before turning to the issue of whether the putative collective members were similarly situated.

### A.  Personal Jurisdiction

Petroplex maintains that the Court lacks general and specific jurisdiction over any claims brought against it by a Texas resident who did not work in New Mexico or, alternatively, who did not work more than 40 hours per week in New Mexico. *Id*. at 6. Notably, this is not the first time Petroplex has broached the topic of personal jurisdiction or highlighted that the majority of its acidizing work takes place in Texas. *See* ECF 7. Indeed, Petroplex previously moved to dismiss Plaintiff's FLSA and NMMWA claims on the ground that the Court lacked personal jurisdiction as to those claims.[11] *Id*. Unsuccessful in those efforts, Petroplex has refined its jurisdictional arguments at the conditional certification stage, asserting once again that the Court may not exercise personal jurisdiction over it as to the claims alleged or to be alleged in this case.

---

[11] In addition to asserting that the Court lacked personal jurisdiction over it, Petroplex also argued that venue was improper in this District and, alternatively, that venue should be transferred to the Western District of Texas. ECF 7. The Court rejected each of these arguments. ECF 23.

Plaintiffs, of course, retain the burden of establishing personal jurisdiction. *See XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 839 (10th Cir. 2020). But at this preliminary stage of litigation, they need only make a *prima facie* showing of personal jurisdiction. *See Warren v. MBI Energy Servs., Inc.*, No. 19-cv-00800-RM-STV, 2020 WL 937420, at *4 (D. Colo. Feb. 25, 2020); *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 964–65 (10th Cir. 2022). That is, they must present evidence—for instance, uncontested allegations in their complaint or declarations—that, if true, would support personal jurisdiction over Petroplex. *See Eighteen Seventy, LP*, 32 F.4th at 965 (citing *XMission*, 955 F.3d at 839). "Two types of personal jurisdiction exist for corporations." *Canaday v. Anthem Co., Inc.,* 9 F.4th 392, 396 (6th Cir. 2021). "A court may assert 'general,' or 'all-purpose,' jurisdiction over a defendant in its home State[,] . . . [o]r a court may exercise 'specific,' or case-based jurisdiction over a defendant if the plaintiff's claims 'arise[ ] out of or relate [ ] to' the defendant's forum State activities." *Id*. (citations omitted).

Turning first to general jurisdiction, the relevant inquiry is whether a corporation is "at home" in the forum state. *See Daimler AG v. Bauman*, 571 U.S. 117, 119 (2014). The Supreme Court has essentially reduced general jurisdiction for corporations to two "at home" locations: (1) the state where it was incorporated; and (2) the state where it is headquartered. *See id*. at 137; *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1559 (2017). Petroplex reports that both its place of incorporation and its principal place of business are in Texas, not New Mexico. ECF 46 at 6. As such, Petroplex maintains, and Plaintiffs do not contest, that this Court lacks general jurisdiction over it for purposes of Plaintiffs' claims.[12] Petroplex's position that the Court does not enjoy general jurisdiction over Plaintiffs' claims against it is consistent with this Court's prior holding

---

[12] In its previous order addressing personal jurisdiction, this Court declined to decide whether it had general personal jurisdiction over Petroplex, because it was satisfied that it had specific personal jurisdiction. *See* ECF 23.

that "this Court does not have general jurisdiction over Petroplex because it does not have the requisite continuous and systematic contacts with New Mexico." *See* ECF 7 at 4.

On the other hand, the Court previously determined that it has specific jurisdiction over the claims asserted against Petroplex in the Complaint. *See* ECF 23 at 10–11. The Court found that Petroplex "purposefully directed its activities at New Mexico" and that "Plaintiff[ Dahl's] alleged injuries . . . arose out of his 'forum-related activities'—namely, working in the oilfields in New Mexico for [Petroplex]." *Id*. at 11. Satisfied that exercising personal jurisdiction over Petroplex "[did] not 'offend[] traditional notions of fair play and substantial justice,'" the Court denied Petroplex's motion to dismiss for lack of personal jurisdiction. *Id*. (citing *Eighteen Seventy*, 32 F.4th at 966). Petroplex now invites the Court to revisit that jurisdictional inquiry, arguing that specific personal jurisdiction is wanting, at least with respect to claims asserted by certain plaintiffs or putative collective members. Relying principally upon the rationale expressed by the United States Supreme Court in *Bristol-Myers Squibb Co v. Superior Court of California, San Francisco County*, 582 U.S. 255, 264 (2017), Petroplex contends that "Plaintiffs have failed to establish specific jurisdiction over [it] with respect to claims by non-New Mexico residents who have no connection to Petroplex's activities in the forum state." ECF 46 at 7 (emphasis added).

Plaintiffs respond that addressing the potential jurisdictional issue raised by *Bristol-Myers* is premature at the conditional certification stage. ECF 47 at 3. They explain that "it is not possible to establish specific personal jurisdiction for each person who joins this lawsuit (or determine whether jurisdictional discovery is necessary) until they actually join it." *Id*. As a practical matter, they reason that if it turns out that every Petroplex employee who joins the FLSA collective performed work in New Mexico, there would in retrospect have been no need for the Court to decide whether *Bristol-Myers* precluded personal jurisdiction. *Id*. at 3–4. Plaintiffs further indicate

that they "do not accept Petroplex's supposition that only a small percentage of its Permian Basin workforce actually worked in New Mexico." *Id.* at 4.

But because Plaintiffs ask the Court to conditionally certify a collective that includes Acidizers/Treaters who worked over 40 hours per workweek in New Mexico *and Texas*, Petroplex points out that "there is the possibility of including residents of Texas . . . who did not work in New Mexico or who did not work over 40 hours in a given workweek in New Mexico." ECF 46 at 10. As to potential claims by Texas residents working overtime in Texas, Petroplex maintains that Plaintiffs have made no efforts to establish personal jurisdiction. *Id.* For instance, it insists that there are no allegations in Plaintiffs' Motion or in the supporting declarations specifying in which state—New Mexico or Texas—the putative collective members resided or worked. *Id.* Moreover, given Mr. Cunningham's attestation that 76% of Petroplex's Acid Treaters/Supervisors over the last three years lived and worked in Texas, Petroplex urges the Court to find that Plaintiffs have failed to make "substantial allegations" that there are putative collective members over whom the Court has specific personal jurisdiction. *Id.* at 11.

There is significant merit to Plaintiffs' position that the Court should defer consideration of the *Bristol-Myers*'s issue until the collective is defined. After all, personal jurisdiction "may be reviewed again at subsequent stages in the trial court proceedings as evidence accumulates." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1069–70 n.3 (10th Cir. 2008) (citation omitted). And, as things currently stand, Plaintiffs have put forth allegations that, if true, appear to make a *prima facie* showing of specific personal jurisdiction over Petroplex as to their claims. *See* ECFs 1 ¶¶ 2.3 (Petroplex "has/had Acidizers/Treaters working in this district"); 3.1 ("the events giving rise to the cause of action . . . occurred in the judicial district"); 3.3 ("the acts and omissions that form the basis of the lawsuit (i.e. [Petroplex's] failure to pay overtime

compensation) occurred within this District."); 45-2 ¶ 8 (Plaintiff Dahl attesting that "Petroplex assigned [him] to work on projects in New Mexico and Texas."); 45-3 ¶ 8 (Ullrich attesting the same); 45-4 ¶ 8 (Martinez attesting the same).

At the same time, however, this Court would not be the first to wade into the issue of *Bristol-Myers*'s application at the conditional certification stage of an FLSA case. *See, e.g.*, *Canaday*, 9 F.4th at 395; *Warren*, 2020 WL 937420, at *1, *5; *Swamy*, 2017 WL 5196780, at *1– 2. Because the Court's decision whether to extend *Bristol-Myers* to this case informs the proper scope of the collective and the corresponding notice to be issued, the Court considers it the better course to resolve the specific jurisdiction issue at this juncture. For if *Bristol-Myers* applies, its holding would deprive this Court of personal jurisdiction over claims by any non-resident collective members who worked only in Texas, and would render Plaintiffs' proposed collective overbroad.[13] Plaintiffs urge the Court to either defer reaching the *Bristol-Myers* issue or to adopt a view that the rationale expressed therein is not suited to the FLSA context. *See* ECF 47 at 2–3. Disinclined to do the former, the Court considers the arguments for and against extending *Bristol-Myers* to FLSA collective actions.

The Court begins its specific jurisdiction inquiry with the very case that provoked its reexamination of personal jurisdiction. In *Bristol-Myers*, over 600 plaintiffs, most of whom were not residents of California, asserted state law products liability claims against a pharmaceutical company related to a drug that the company manufactured and sold. 582 U.S. at 259. Although the pharmaceutical company sold the subject drug in California, the nonresident plaintiffs did not

---

[13] In contrast to Plaintiffs' proposed Rule 23 class, in which they preliminarily define the class as Acidizers/Treaters who worked more than 40 hours per workweek *in New Mexico* [*see* ECF 1 ¶ 62], Plaintiffs request conditional certification of an FLSA collective that includes Acidizers/Treaters who worked more than 40 hours per workweek in *New Mexico and Texas*. ECF 45 at 9. In other words, Plaintiffs do not restrict the putative FLSA collective to those who would satisfy the requirements of *Bristol-Myers* if they in fact apply.

allege that they obtained the drug from a California source, that they were injured by the drug in California, or that they were treated for injuries in California. *Id*. at 259–60. The court reasoned that "[t]he mere fact that *other* plaintiffs were prescribed, obtained, and ingested [the drug] in California—and allegedly sustained the same injuries as did the nonresidents—[did] not allow the State to assert specific jurisdiction over the nonresidents' claims." *Id*. at 265. In short, because the nonresident plaintiffs did not claim to have suffered harm in California, there was a missing "connection between the [California] forum and the specific claims." *Id*. at 265. As a result, the Supreme Court held that the Fourteenth Amendment's Due Process Clause prohibited the California state court from exercising specific jurisdiction over the state-law claims asserted by plaintiffs who did not reside in California against the defendant pharmaceutical company. *Id*. at 268-69. The Court expressly "le[ft] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction *by a federal court*" in a case involving federal law. *Id*. at 269 (citing *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co*., 484 U.S. 97 (1987) (emphasis added)). The instant case squarely presents that still open question in the FLSA context.

As Petroplex observes, three federal circuits have since applied *Bristol-Myers* to FLSA collective actions, requiring *each* opt-in plaintiff to establish specific jurisdiction over the defendant. ECF 46 at 8 (citing *Fischer v. Fed. Express Corp*., 42 F.4th 366 (3d Cir. 2022); *Canaday*, 9 F.4th 392 (6th Cir. 2021); *Vallone v. CJS Sols. Grp., LLC*, 9 F.4th 861 (8th Cir. 2021)). Moreover, Petroplex notes that federal district courts in Arizona and Texas have likewise extended *Bristol-Myers*'s holding to FLSA collective actions. ECF 46 at 9 (citing *Wilkerson v. Walgreens Specialty Pharmacy, LLC*, 637 F. Supp. 3d 718, 731 (D. Ariz. Oct. 27, 2022); *Martinez v. Tyson Foods, Inc*., 533 F. Supp. 3d 386, 392 (N.D. Tex. 2021); *Greinstein v. Fieldcore Serv. Sols., LLC*, No. 2:18-CV-208-Z, 2020 WL 6821005, at *4 (N.D. Tex. Nov. 20, 2020); *Loebsack v. Dufresne*

*Spencer Grp., LLC*, No. 4:21-cv-1884, 2022 WL 2959718, at *5 (S.D. Tex. July 11, 2022)). Conceding that the Tenth Circuit has not yet weighed in, Petroplex highlights a decision from the District of New Mexico in which Chief Judge William Johnson extended *Bristol-Myers*'s holding to an FLSA collective action: *Bone v. XTO Energy, Inc.*, 561 F. Supp. 3d 1132, 1137 (D.N.M. 2021).

Plaintiffs oppose extending *Bristol-Myers* to FLSA collective actions, and they too have persuasive authority from which to draw support. *See* ECF 47 at 2–4. They insist that the "prevailing" and "correct" view, as originally expressed in *Swamy v. Title Source, Inc.*, No. C 17-01175 WHA, 2017 WL 5196780 (N.D. Ca. Nov. 10, 2017) and recently adopted by the District of Colorado in *Warren*, 2020 WL 937420, is that *Bristol-Myers*'s rationale should not be extended to FLSA collective actions. ECF 47 at 2–4. Although it is not clear to this Court that Plaintiffs' view is the "prevailing" view, there is no question that the circuits are split over this issue. *Compare Fischer*, 42 F.4th 366; *Canaday*, 9 F.4th 392; *Vallone*, 9 F.4th 861 (extending *Bristol-Myers* to FLSA collective actions), *with Waters v. Day & Zimmerman NPS, Inc.*, 23 F.4th 84 (1st Cir. 2022) (concluding that *Bristol-Myers* does not apply to FLSA collective actions). Notably, the First Circuit adopted an approach similar to the one Plaintiffs favor here. *See Waters*, 23 F.4th 84. Plaintiffs do not cite *Waters*, however. Instead, they quote at length from *Warren*, where the District of Colorado expressly followed the *Swamy* line of cases. *See* ECF 47 at 2–3 (quoting *Warren*, 2020 WL 937420, at *6).

In *Swamy*, the Northern District of California reasoned that, unlike state law mass tort actions, an FLSA collective action is a *federal* claim created by Congress to address nationwide employment practices. 2017 WL 5196780, at *2. The *Swamy* court emphasized that the FLSA "in no way limited" FLSA claims to "in-state plaintiffs." *Id*. Moreover, the Northern District of

California warned that extending the rationale of *Bristol-Myers* to FLSA collective actions would "splinter most nationwide collective actions, trespass on the expressed intent of Congress, and greatly diminish the efficacy of FLSA collective actions as a means to vindicate employees' rights." *Id*. For these reasons, the court held that if a defendant against whom an FLSA collective action is brought is subject to personal jurisdiction for claims brought by the *named plaintiff*, the court may exercise jurisdiction as to the entire collective action. *Id.*

In *Warren*, the District of Colorado articulated three compelling reasons why it found the *Swamy* line of cases more persuasive than those going the other direction. 2020 WL 937420, at *6. First, it, too, found "the FLSA collective action context . . .  fundamentally distinguishable from the mass tort action . . . in *Bristol-Myers*." *Id*. The *Warren* court reasoned that FLSA collective actions involve *one* suit in which a plaintiff may represent other class members, whereas a mass tort action involves "independent suits with independent parties in interest . . . joined for trial." *Id*. In *Warren*, like here, the FLSA suit arose out of and related to the defendant's contacts with the forum state, whereas the same could not be said for the mass tort action in *Bristol-Myers*. *Id*. The *Warren* court was satisfied that the non-resident-plaintiff forum-shopping concerns that the Supreme Court expressed in *Bristol-Myers* were assuaged there, where the defendant's "sufficient contacts" with the forum state related to the plaintiff's FLSA claims. *Id*. Second, recounting the policy concerns expressed by the court in *Swamy*, the District of Colorado worried that a "broader reading of *Bristol-Myers*" might "frustrate Congress' goals in passing the FLSA." *Id*. at *2. Because Congress did not expressly limit FLSA collective actions in the manner *Bristol-Myers* limited mass state-law tort actions (*i.e.*, to resident plaintiffs in the forum state or in a state where the defendant is "at home"), the court was concerned that expanding the reach of *Bristol-Myers* would effectively "substitute its judgment for that of Congress." *Id*. at *7. Third, the court

suggested that "[i]t is well settled that the original plaintiff in a collective action under the FLSA dictates a district court's analysis of specific jurisdiction." *Id.* (citing *Sieffert v. Qwest Corp.*, No. CV-18-70-GF-BMM, 2019 WL 859045, at *4 (D. Mont. Feb. 22, 2019); *Szewczyk v. United Parcel Serv., Inc.*, No. 19-1109, 2019 WL 5423036, at *8 (E.D. Pa. Oct. 22, 2019)). In other words, where a court has specific jurisdiction over the named plaintiff's FLSA claims against the defendant employer, the personal jurisdiction inquiry ends there. Finally, making a practical observation, the *Warren* court predicted that "the ultimate [FLSA] certification issue could be delayed continually 'if the district court had to evaluate whether it possessed personal jurisdiction over each new opt-in plaintiff.'" *Id.* (quoting *Sieffert v. Qwest Corp.*, No. CV-18-70-GF-BMM, 2018 WL 6590836, at *4 (D. Mont. Dec. 15, 2018)).

Chief Judge William Johnson of this District offered a competing view in *Bone*, a case relied upon by Petroplex. *See* ECF 46 at 6–11 (citing *Bone*, 561 F. Supp. 3d at 1135–37). He identified three reasons why, in his view, the specific jurisdiction rule established in *Bristol-Myers* should extend to FLSA collective actions. *Bone*, 561 F. Supp. 3d at 1135–38. First, he concluded that the FLSA's identity as a federal law did not—by itself—render *Bristol-Myers* inapplicable. *Id.* at 1136–37. Although he acknowledged that *Bristol-Myers* addressed personal jurisdiction by a *state court* pursuant to the Fourteenth Amendment, Chief Judge Johnson reasoned that applicable rules of procedure effectively render Fourteenth Amendment considerations central to the personal jurisdictional inquiry even in federal court. *Id.* ("despite beginning with a federal statute, this legal journey leads right back to the Fourteenth Amendment issue at the heart of *Bristol-Myers*").[14]

---

[14] According to Chief Judge Johnson's logic, explored in more detail in connection with the Court's discussion of *Canaday*, when the other provisions of Federal Rule of Civil Procedure 4(k) do not apply, (*i.e.*, the federal statute at issue does not contain a nationwide service of process provision and the plaintiff has not joined the defendant via Rule 14 or 19), Rule 4(k)(1) effectively constrains the federal court's reach to the personal jurisdictional limits of the state where the court is located. *Canaday*, 9 F.4th at 400. As a result, the same Fourteenth Amendment personal jurisdiction analysis applies in federal court, even though questions as to personal jurisdiction traditionally implicate the Fifth Amendment, not the Fourteenth, in federal court. *See Bristol-Myers*, 582 U.S. at 269 (acknowledging that the Fifth

Second, Chief Judge Johnson concluded that "similarities" between FLSA collective actions and mass actions, like the one at issue in *Bristol-Myers*, warranted a "similar application of law." *Id.* at 1137. He highlighted one such similarity: party status. *Id.* Adopting the Sixth Circuit's analysis in *Canaday*, Chief Judge Johnson explained that "[i]n a FLSA collective action, as in the mass action under California law, each opt-in plaintiff becomes a real party in interest, who must meet her burden of obtaining relief and satisfy the other requirements of party status." *Id.* (quoting *Canaday*, 9 F.4th at 397) (subsequent citation omitted). Finally, he concluded that Congress's intention of creating in the FLSA an efficient mechanism for vindicating employees' rights nationwide did "not soften th[e] Court's obligation," as he saw it, to apply *Bristol-Myers* as "binding precedent." *Id.* at 1138. He acknowledged a "troubling conflict" between Congress's likely intent and the "sting" generated by applying *Bristol-Myers* in the FLSA context, but he left it to future FLSA plaintiffs to pursue collective actions in a defendant's home state or to Congress to protect FLSA collective actions by amendment. *See id.*

The reasons Chief Judge Johnson articulated in *Bone* for extending *Bristol-Myers* to the FLSA context were largely derived from the Sixth Circuit's analysis in *Canaday*. *See id.* at 1136–37. In *Canaday*, the majority concluded that *Bristol-Myers*'s holding applied with equal force to FLSA collective actions. 9 F.4th at 394–404. As the majority put it, when "nonresident plaintiffs opt into a putative collective action under the FLSA, a court may not exercise specific personal jurisdiction over claims unrelated to the defendant's conduct in the forum State." *Id.* at 397. In her dissent, Judge Bernice Bouie Donald outlined the most persuasive counterpoints to the majority's rationale. She framed the relevant issue as "whether a federal court may assert jurisdiction over a defendant in an FLSA collective action when nonresident opt-in plaintiffs who form the collective

Amendment governs the exercise of personal jurisdiction by a federal court).

action allege they were harmed by the defendant outside of the forum state in which the federal court is located." *Id*. at 404. And she insisted that for 79 years—until employers began urging application of *Bristol-Myers* to FLSA collective actions—the answer to that question had been "yes." *Id*. Ultimately, Judge Donald found nothing in *Bristol-Myers* to persuade her that non-resident opt-in FLSA plaintiffs are foreclosed from joining collective actions to vindicate harm arising outside the forum state. *Id*. at 404–15. *Canaday*'s majority and dissenting opinions, when considered together, offer a thorough and balanced discussion of *both* sides of the *Bristol-Myers*'s issue.

Both the majority and dissenting personal jurisdiction analyses were, to some extent, guided by Federal Rule of Civil Procedure 4(k). *See Canaday*, 9 F.4th at 398–400, 407–09 (citing Fed. R. Civ. P. 4(k)). Rule 4(k) provides that "[s]erving a summons or filing a waiver of service *establishes personal jurisdiction* over a defendant" in three scenarios: (1) when the defendant is "subject to the jurisdiction of a court of general jurisdiction in the state where the district is located" (*i.e.*, when the forum state has the authority to exercise personal jurisdiction over the defendant); (2) when the defendant is joined under Federal Rules of Civil Procedure 14 or 19; and (3) when authorized by federal statute. Fed. R. Civ. P. 4(k). With respect to the third scenario, the majority observed that an express nationwide service of process provision is sometimes embedded in a federal statute such that a claimant is authorized to sue a party in any of the country's 94 federal district courts. *Canaday*, 9 F.4th at 395–96. The *Canaday* judges all agreed that the FLSA did not include a nationwide service of process provision. *Id*. at 387, 407. They further agreed that because the named plaintiff in *Canaday* did not join her employer as a defendant under Rules 14 or 19, the personal jurisdiction analysis was governed by Rule 4(k)(1)(A), which required a showing that the defendant employer was subject to jurisdiction in the host state (*i.e.*, Tennessee). *Id*. Given that the

employer was headquartered and incorporated in a state other than Tennessee, the Sixth Circuit quickly ruled out general personal jurisdiction. *Id*. at 397, 407–08. Its analysis of specific personal jurisdiction was more onerous, however, principally due to the unresolved issue of *Bristol-Myers*'s application to FLSA collective actions. Careful consideration of the rationale underlying the majority and dissenting opinions goes a long way in helping the Court arrive at a decision as to whether *Bristol-Myers* should extend to FLSA cases.

The majority likened FLSA collective actions to *Bristol-Myers*-type mass actions, emphasizing that opt-in FLSA plaintiffs enjoy "party status" like mass action plaintiffs. *Id*. at 397. In the view of the majority, and nearly every circuit to address the issue, an opt-in plaintiff becomes a "real party in interest" when he files a consent.[15] *See id*.; *see also Waters*, 23 F.4th at 90 ("Almost all circuits to address this issue interpret the [FLSA] as making opt-in plaintiffs parties to the action as soon as they file consent forms") (citations omitted). This being so, the majority concluded that opt-in plaintiffs must thereafter "satisfy the other requirements of party status." *Canaday*, 9 F.4th a 397 ("The key link is party status. In an FLSA collective action, . . . each opt-in plaintiff becomes a real party in interest, who must meet her burden for obtaining relief and satisfy the other requirements of party status."). Although the majority did not explicitly identify the "other requirements" to be satisfied by opt-in plaintiffs, the Court surmises from the majority's analysis that they include demonstration of personal jurisdiction over the defendant consistent with the Fourteenth Amendment and *Bristol-Myers*. *See id*. at 397 (reasoning that a court may not exercise

---

[15] Relevant to party status, the FLSA authorizes employees to sue "in any Federal or State court of competent jurisdiction" on "behalf of . . . themselves and other employees similarly situated[,]" and similarly situated employees may join a collective action by filing a "consent in writing," after which they become "party plaintiff[s]." 29 U.S.C. § 216(b); *see also Waters v. Day & Zimmerman NPS, Inc.*, 23 F.4th 84 (1st Cir. 2022); *Canaday v. Anthem Companies*, 9 F.4th 392, 394 (6th Cir. 2021). Each opt-in plaintiff amounts to an "individual claimant" whose action "commenced" on the day he filed his written consent. 29 U.S.C. § 256.

specific personal jurisdiction over claims by non-resident opt-in plaintiffs that are unrelated to the defendants' conduct in the forum State).

For her part, Judge Donald challenged the majority's assumption that the "party" label altered the court's personal jurisdiction analysis or meant that opt-in plaintiffs were required to independently demonstrate personal jurisdiction consistent with *Bristol-Myers*. *Id*. at 414 ("Whatever status the 'party' label might confer on opt-in plaintiffs, it does not radically alter the overall representative character and nature of the collective, which retains its status as a single lawsuit."). Judge Donald observed that there was little guidance as to the implications of "party status" in the FLSA context. *Id*. (citing *Halle v. W. Penn Allegheny Health Sys., Inc*., 942 F.3d 215, 225 (3d Cir. 2016) ("This prompts the as-yet unanswered question of what 'party status' means in a collective action . . . .")).

Judge Donald emphasized that, regardless of the "party status" conferred on opt-in plaintiffs, "the only logical reading of Rule 4 is that service is deemed effective based *only* on whether the *original named plaintiff* complies with Rule 4." *Id*. at 409 (citing Fed. R. Civ. P. 4(b)–(c)(1)); *see also id*. at 399–400 (majority acknowledging that the opt-in plaintiffs are faced with "no additional service obligation under . . . Rule 4(k)"). And where the named plaintiff has already properly served the defendant, the federal court could, in Judge Donald's view, assert personal jurisdiction over the entire FLSA action with no additional jurisdictional requirements imposed by Rule 4(k). *Canaday*, 9 F.4th at 409; *see also* Fed. R. Civ. P. 4(k) (linking service of process to "establish[ing] personal jurisdiction).

The First Circuit fleshed out a similar understanding of Rule 4(k) in *Waters*. It observed that "the text [of Rule 4(k)] nowhere suggests that [it] deals with anything other than service of a summons, or that Rule 4 constrains a federal court's power to act once a summons has been

properly served, and personal jurisdiction has been established." *Waters*, 23 F.4th at 94. Indeed, the *Waters* court found "no textual basis in Rule 4 for concluding that [a federal] court's exercise of jurisdiction over the opt-in claims would be improper when 'there is no dispute the named plaintiff properly served [the defendant]' by serving a summons in accord with Rule 4(c)." *Id*. (citation omitted); *see also* Fed. R. Civ. P. 82 (providing that the Federal Rules of Civil Procedure "do no extend or limit the jurisdiction of the district courts."). After discussing the legislative history of Rule 4 and the operation of other rules of civil procedure, the court explained that "Rule 4 is concerned with initial service, not jurisdictional limitations after service." *Id*. at 98–99 (citation omitted). Accordingly, the court determined that Rule 4(k) did not limit the federal court's jurisdictional authority over "added plaintiffs" who assert federal law claims after service was effectuated, though it acknowledged that "the court's jurisdiction [was] still subject to constitutional limitations—in the case of federal-law claims, the Fifth Amendment." *Id*. at 99.

The logic articulated by Judge Donald and later by the First Circuit with respect to the operation of Rule 4(k) is well-reasoned and persuasive. Indeed, neither the legislative history of Rule 4, nor the rule's express language, indicate that it constrains a federal court's exercise of personal jurisdiction over a defendant as to claims by an out-of-state FLSA opt-in who becomes party to the action after the named plaintiff has effected service.[16]

---

[16] Relatedly, the majority in *Canaday* addressed and rejected the plaintiff's position that personal jurisdiction should be analyzed "at the level of the *suit* rather than at the level of each *claim*." 9 F.4th at 400 (emphasis added). In doing so, it relied upon the Supreme Court's explanation in *Bristol-Myers* that specific personal jurisdiction requires "a connection between the forum and the *specific claims* at issue." *Id*. (quoting *Bristol-Myers*, 582 U.S. at 265). But Judge Donald plucked a *different* sentence from *Bristol-Myers* to support her opposing view: "[i]n order for a state court to exercise specific jurisdiction, *the suit* must arise out of or relate to the defendant's contacts with the forum." *Id*. at 408 (quoting *Bristol-Myers*, 582 U.S. at 262). The Court is not convinced that *Bristol-Myers* provides clear direction as to whether personal jurisdiction should be analyzed at the suit or claim level. More importantly, the Court agrees with the notion, discussed *infra*, that FLSA collective actions comprise a single suit from inception, and that the addition of opt-in plaintiffs thereafter does not fundamentally change the dynamics of the suit. *See Waters*, 23 F.4th at 93–99; *Warren*, 2020 WL 937420 at *7. Notably, this view is consistent with the traditional approach in FLSA collective actions, to which Judge Donald alluded, of permitting jurisdiction over the defendant for claims by out-of-state FLSA plaintiffs so long as personal jurisdiction existed in relation to the original named plaintiff. *See Canaday*, 9 F.4th at 404–14 (J. Donald, dissenting).

As to the *Canaday* majority's position that "party status" of opt-in plaintiffs makes FLSA actions similar to *Bristol-Myers*-type mass tort actions, Judge Donald found no support in the text of the FLSA or otherwise. *Canaday*, 9 F.4th at 414. Unlike mass tort actions, she observed that FLSA collective actions are "not a consolidated series of separate lawsuits[,]" each retaining a separate identity but a "single representative action . . . proceed[ing] on the basis that one (or more) named plaintiff(s) represents the claims of the entire collective." *Id.* at 412. And she highlighted another distinguishing feature of FLSA collective actions: they are "part of a comprehensive federal regulatory scheme that contemplates and strives for efficient resolution of FLSA claims." *Id.* (citing *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1264 (11th Cir. 2008)). According to Judge Donald, "[t]hese critical differences—coupled with the fact that *Bristol-Myers* did not proscribe any limitations on federal jurisdiction over federal collective actions—require[d the conclusion] that *Bristol-Myers* does not prevent the [federal] district court's assertion of personal jurisdiction over" the defendant. *Id.* at 413. Again, the Court finds Judge Donald's reasoning compelling and remains unconvinced that the "party status" of opt-in FLSA plaintiffs necessitates application of *Bristol-Myers*.

Next, in support of their position that *Bristol-Myers* applies to FLSA collective actions but not class actions, the *Canaday* majority characterized the two types of litigation as "fundamentally different." *Id.* at 402 (citing *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66 (2013)). Whereas a Rule 23 class action is unquestionably representative in nature, the majority suggested that Congress amended the FLSA to "put an end to representational litigation in the context of actions proceeding under § 216(b)." *Id.* In addition, the majority described that the FLSA opt-in process, whereby a plaintiff must affirmatively decide to join a collective action, as a "distant cry from how a Rule 23 class action works." *Id.* at 402–03.

Judge Donald took a different view. She opined that "[t]he 'opt-out' vs. 'opt-in' distinction does not detract from the fact that both class and collective action are single *representative* lawsuits." *Id*. at 413 (emphasis added). Responding to the majority's suggestion that FLSA amendments eliminated representational litigation, Judge Donald examined the legislative history of the amendments and accused the majority of mischaracterizing the purpose of the amendments. *Id*. at 413. She explained that, prior to the amendments, individuals who did not have their own FLSA claims, such as union officials, were permitted to file collective actions on behalf of employees. *Id*. (citing *Hoffmann-La Roche v. Sperling*, 493 U.S. 164, 173 (1989)). Judge Donald further explained that, by amending the FLSA to ban this variety of "representative" actions, Congress was merely trying to eliminate "spurious representative actions, not eliminate the representative nature of collective actions altogether." *Id*. at 413 (citation omitted). She insisted that FLSA collective actions have remained—by nature—representative, even post-amendment. *Id*. at 414 (reasoning that the defendant "ha[d] not explained how the 'party' label change[d] the representative nature of the collective.") (citation omitted). Given the similarities between FLSA collective actions and class actions—most notably their representative nature—Judge Donald opined that the Sixth Circuit's decision in *Lyngaas v. Curaden Ag*., 992 F.3d 412, 433 (6th Cir. 2021), in which it determined that *Bristol-Myers* did *not* apply to class actions, likewise foreclosed application of *Bristol-Myers* in the FLSA context. *Id*. at 402.

The Court acknowledges that there are notable differences between FLSA actions and class actions. For instance, FLSA putative plaintiffs must opt *in* as well as demonstrate that they are similarly situated. Nevertheless, the Court is not convinced that these distinct features of FLSA collective actions weigh against a consistent jurisdictional jurisprudence. Rather, the Court agrees with Judge Donald that the common representative nature of FLSA and class actions dictates that

24

if *Bristol-Myers* does not apply to class actions, it should likewise not extend to FLSA collective actions. *See also Waters*, 23 F.4th at 99 (explaining that despite the "myriad ways" in which FLSA collective actions and class actions are dissimilar, "[t]he paramount similarity, and *the one that matters for purposes of assessing [a] district court's jurisdiction* . . . , is that the named plaintiff in both actions is the only party responsible for servicing the summons, and thus the only party subject to Rule 4.") (emphasis added).

Finally, the majority and dissenting opinions in *Canaday* attributed different objectives to the *Bristol-Myers* Court. The majority read *Bristol-Myers* broadly as an effort to protect corporate defendants from claims by out-of-state plaintiffs, when there is no "claim-specific and [defendant]-specific relationship between [those] out-of-state claims and [the forum state]." *See id*. at 396–97. In contrast, Judge Donald considered *Bristol-Myers*'s "primary focus" to be "reaffirm[ing] two long-standing and uncontroversial principles of horizontal federalism": (1) that state courts may exclusively adjudicate state-law claims arising within their borders; and (2) that due process protects non-resident defendants from being forced to submit to the authority of a state court without a legitimate state interest to hear claims against them. *Id*. at 410. Because an FLSA collective action filed in federal court implicates only federal law, Judge Donald suggested that such a case did not present the same concerns concerning state sovereignty and horizontal federalism. *Id*. at 411. The issues of state sovereignty and federalism are likewise not at play here, where the instant FLSA collective action was filed in federal court, and the Court therefore concludes that the objectives underscoring the Court's rationale in *Bristol-Myers* are not served by extending its holding.

Ultimately, for the reasons expressed in *Waters* and by Judge Donald's dissent in *Canaday* as well as the reasons discussed by the district courts in *Swamy* and *Warren*, the Court concludes

that *Bristol-Myers* does not extend to this case or divest the court of jurisdiction over the claims of putative collective members who resided in Texas and worked more than 40 hours per workweek for Petroplex only *in Texas*. As was the case in *Warren*, and as this Court has already found, the FLSA claims of the named plaintiff here arise out of and relate to Petroplex's contacts with New Mexico. *See* ECF 23. And, significantly, the FLSA itself does not purport to preclude claims by out-of-state opt-in plaintiffs. *See Swamy*, 2017 WL 5196780, at \*2 (citing 29 U.S.C. § 216(b) and observing that the FLSA "in no way limited" claims to "in-state plaintiffs"). From a policy perspective, permitting all available opt-in plaintiffs, including non-resident plaintiffs, to pursue their FLSA claims against Petroplex in the same proceeding promotes efficiency and uniformity in the resolution of common issues of law and fact. In contrast, fracturing the current FLSA collective litigation into multiple separate lawsuits would lead to potentially disparate judgments and would risk burdening the federal courts with duplicative work. Moreover, absent a clear directive from the Tenth Circuit or Supreme Court as to *Bristol-Myers*'s application to FLSA claims filed in federal court, the Court will not extend its holding in a way that threatens to undermine the congressional policy of providing an efficient mechanism for similarly situated employees to enforce wage and hour laws against their employer in a single collective action. *See Hoffmann-LaRoche Inc.*, 493 U.S. at 173 ("The broad remedial goal of the [FLSA] should be enforced to the full extent of its terms."); *see also Waters*, 23 F.4th at 97 (concluding that applying *Bristol-Myers* to FLSA actions in federal court would frustrate the FLSA's key purposes of enforcement and efficiency) (citation omitted). For all of these reasons, the Court holds that *Bristol-Myers* does not limit the Court's exercise of personal jurisdiction over claims by Plaintiff Dahl, the opt-in Plaintiffs, or the putative collective.

**B. Putative Collective Members Are Similarly Situated and Subject to a Single Policy Decision, Policy, or Plan**

By Plaintiffs' account, the putative collective members are all similarly situated for purposes of the FLSA in that they each:

> (1). . . [were] paid on a salary basis and a daily job bonus, regardless of the hours worked; (2) were all required or permitted to work overtime without receiving compensation at the legal rate of pay; (3) were all employees [that] Petroplex . . . misclassified as exempt from overtime; and ([4]) all performed Acid Treater/Acidizer duties for Petroplex in the oilfield.

ECF 45 at 15 (citing ECF 1; 45-2; 45-3; 45-4). To make the threshold showing, Plaintiffs argue that they and the putative collective members "share a common employment experience, including the same general job duties: loading equipment at the facility, rigging up/rigging down equipment at the [job] location[,] and operating acidizing pumps in accordance with the acidization procedure set out by company representatives." *Id*. at 12 (citing ECFs 45-2 ¶¶ 9–19; 45-3 ¶¶ 9–19; 45-4 ¶¶ 9–19). Plaintiffs point to discovery responses in which Petroplex enumerates 31 "Acid Supervisors who worked for [Petroplex] from April 20, 2020[,] to the present in the Permian Basin (Eastern New Mexico and West Texas)."[17] *Id*. (citing ECF 45-9 at 7, 12–13). Plaintiffs allege that the putative collective members "all generally performed Acid Treaters/Acidizers' Duties (no matter their title)[,]" relying on statements to this effect in their declarations. *Id*. at 13 (citing ECFs 45-2 ¶¶ 8–19; 45-3 ¶¶ 8–19; 45-4 ¶¶ 8–19). They reiterate that Petroplex required the putative collective members to work in excess of 40 hours per week but paid them on a salary-plus-daily-job-bonus basis with no overtime pay. ECF 45 at 13 (citing ECFs 1 ¶¶ 2.4, 5.9, 5.21, 5.25; 45-2 ¶¶ 4–7; 45-3 ¶¶ 4–7; 45-4 ¶¶ 4–7). To summarize, Plaintiffs insist that they "made a strong preliminary showing, through the well-pleaded Complaint, together with the declarations and other evidence,

---

[17] In their response to Plaintiffs' interrogatory, Petroplex stated that the identified individuals "worked in New Mexico within the [relevant] period." ECF 45-9 at 7.

that Petroplex subjected them and all other Putative [Collective] Members to the same compensation policies; and that these policies violated the FLSA." *Id*. at 20.

Petroplex effectively concedes that it employed and continues to employ Acidizers/Treaters under a singular pay policy. *See, e.g.*, ECF 24 ¶ 47 (answering Paragraph 5.27 of Plaintiff's Complaint by admitting that it "has employed and continues to employ Acid treaters under similar pay policies as [Dahl] but den[ying] the remaining allegations of Paragraph 5.27.") Nevertheless, it insists that Plaintiffs have failed to show that the putative collective was similarly situated in that other Acidizers/Treaters worked more than 40 hours per workweek *in New Mexico*. ECF 46 at 2. Although Petroplex couches this argument as a failure to demonstrate similarly situated putative collective members, the crux of Petroplex's argument appears to rest on personal jurisdiction grounds. *See id*. at 5–11 (arguing that Plaintiffs' Motion should be denied because Plaintiffs have not shown that there are similarly-situated current or former Petroplex employees *over whom this Court has personal jurisdiction*).

Having already resolved this jurisdictional issue in Plaintiffs' favor, the Court is satisfied that the Complaint, Motion, and supporting exhibits meet the requirements for conditional certification in that they contain substantial allegations that Plaintiffs and other Petroplex Acidizers/Treaters were subject to the same allegedly illegal policy of compensation: salary-plus-daily-job-bonus basis with no overtime pay for hours worked in excess of 40 per workweek. Jurisdictional arguments aside, Petroplex does not develop any compelling arguments to the contrary. Accordingly, the Court has little difficulty concluding that Plaintiffs have met their modest burden to provide "substantial allegations that the putative [collective] members were together the victims of a single decision, policy, or plan." *See Thiessen*, 267 F.3d at 1102 (citations omitted).

**C. The Court Will Give the Parties an Opportunity to Confer and Submit Joint Proposed Notice and Consent Forms to the Court**

Plaintiffs append to their Motion for Conditional Certification proposed Notice and Consent forms. *See* ECF 45-1. They insist that "variations" of these forms "have been adopted by courts throughout the United States." *Id*. at 24. They ask the Court to conditionally certify and authorize notice to current and former Acidizers/Treaters at Petroplex, who worked in New Mexico and Texas beginning three years preceding the date of this lawsuit and who were paid on a salary-plus-daily-job-bonus basis without receiving overtime pay for hours worked in excess of 40 per week. ECF 45 at 9.

In response, Petroplex argues that "the scope of the collective should be limited to those current and former Petroplex employees who reside and work in New Mexico." ECF 46 at 11. This argument follows from Petroplex's position, addressed above, that *Bristol-Myers* extends to FLSA collective actions to prevent out-of-state opt-in plaintiffs from asserting claims based on work performed outside of New Mexico. But having determined that *Bristol-Myers* does *not* apply to FLSA collective actions, the Court need not narrow the scope of the putative collective as Petroplex requests.

To assist in providing notice of the putative collective action, Plaintiffs ask the Court to order Petroplex to supply contact information for current and former employees. ECF 45 at 25–26. Petroplex insists that it has "already provided . . . a list of [Acidizers/Treaters] from April 20, 2020 to [August 2023,] who worked in the Permian Basin (Eastern New Mexico and West Texas) along with the contact information that it has for each individual." ECF 46 at 11–12. In fact, Petroplex explains that Plaintiffs attached the supplied contact information as Exhibit I to their Motion for Conditional Certification. ECF 46 at 12 n.2 (citing ECF 46-9).[18] Plaintiffs do not respond to

---

[18] Petroplex complains that Plaintiffs violated a protective order entered by the Court when they filed the contact

Petroplex's contention or otherwise suggest that the information Petroplex provided was incomplete. *See* ECF 47. Thus, because Petroplex apparently has already satisfied Plaintiffs' request for contact information, the Court will deny the request as moot.

Petroplex advances a handful of technical objections to Plaintiffs' proposed Notice and Consent forms. For instance, it advocates for the inclusion of additional language that would notify putative collective members that (1) they risk incurring potential costs if they do not prevail on their claims; and (2) they will be required to preserve relevant evidence. ECF 46 at 12–14. In addition, Petroplex insists that contact by mail, e-mail, and text message suffices such that the reminder notices and live phone calls that Plaintiffs seek are not warranted under the circumstances. *Id.* at 13–14. Plaintiffs do not directly respond to Petroplex's objections. *See* ECF 47 at 4. Instead, they request an opportunity to confer and to submit a joint notice proposal to the Court. *Id.* Given that only narrow and discrete disagreements remain as to the proposed Notice, Plaintiffs' request is a fair one. Bearing in mind that "it should not alter [P]laintiff[s'] proposed notice unless such alteration is necessary, *see Landry,* 252 F. Supp. 3d at 1127, the Court reserves ruling on the proposed Notice and Consent forms and will afford the parties an opportunity to further confer. Within 14 days of entry of this Order, the parties shall jointly submit stipulated Notice and Consent forms and any agreements as to the noticing process. If the parties cannot settle on a joint submission or stipulation, they shall file their competing proposals for the Court's consideration.

---

information as an exhibit to their Motion without redacting any of the information therein. ECF 46 at 12 n.2. The Court's review of the docket indicates that Plaintiffs' Motion, including the confidential exhibit, is now filed under seal. *See* ECF 45 (designated for access by "case participants" only).

## V.   CONCLUSION

IT IS ORDERED that Plaintiffs' Motion for Conditional Certification is GRANTED IN PART and RULING IS RESERVED IN PART, as follows:

(1) This case is conditionally certified as a collective action pursuant to 29 U.S.C. § 216(b) and will proceed as such unless good cause is shown to decertify the collective. The collective will be defined as:

> All current and former Acid Treaters/Acidizers who [were] employed with [Petroplex], and who, like Plaintiff, were paid on a salary basis and daily job bonus and were not paid time and one-half their respective rates of pay for all hours worked over forty in each seven-day workweek in New Mexico and Texas beginning three years preceding the date the lawsuit was filed and forward.

(2) The Court reserves ruling as to the Notice and Consent forms. Within 14 days of entry of this Order, after conferring, the parties will jointly submit Notice and Consent forms and any additional stipulations as to the noticing process, or, if the parties cannot agree, they shall file their competing Notice and Consent forms and noticing proposals for the Court's consideration.

**SO ORDERED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***